The case for argument this afternoon is 24-1936, Teva v. Amneal Pharmaceuticals. Mr. J. Good afternoon, Your Honors, and may it please the Court. The District Court erred in ordering these patents out of the Orange Book for three principal reasons. One, the District Court concluded that these patents don't claim the drug for which the applicants submitted the application. The District Court and Amneal don't give the ordinary meaning of the word claim or the statutory meaning of the word drug. That would be enough to reverse by itself, but there's more. The second problem with the District Court's and Amneal's reading is that they ask this Court to slice apart a new drug application and treat its boundaries as somewhere different than FDA itself treats them. FDA treats a metered dose inhaler, including the inhaler parts, including the dose counter, as a drug. It's reviewed under the new drug application provisions of the statute. The parallel provisions in the listing statute should have the same treatment. And the third point is just the consequences of Amneal's interpretation, which would order genus patents and a patent on a single active ingredient in a combination two active ingredient product out of the Orange Book. Can I ask, so why shouldn't we say that what is, I think, conceitedly and established by the FDA as a combination device drug is, in fact, not a drug. It is a combination for which the FDA, under statutory authorization, can say and here did say, we have to choose regimes. There isn't a separate regime for combinations. We're going to choose the drug regime, but that doesn't mean it is a drug. I don't think that you could do that, Your Honor, and not consistent with both the listing statute and the drug statute of which it is a part or with the combination product statute. And so let me walk you through that. So the combination product statute directs that FDA review a combination product in a single application. And in this case, because the active ingredient in a metered dose inhaler is primarily responsible for its effect on the human body, FDA has very clearly said, and this is in the guidance in the appendix at 1487 to 1488 that, or 88 to 89, that metered dose inhalers are to be reviewed as a drug. And they would treat for, they would treat a. And I just, I mean, just to be, it seems to me there's a difference between we will review it as a drug and it is a drug. So, but I think for purposes of review and for purposes of the listing statute, what matters is that it's part of the new drug application for which FDA is reviewing, which FDA is reviewing for safety and efficacy because the listing statute is part of 355B, which governs the contents of a new drug application. And I think that if you look at, actually, the provision of the combination product statute that our friends on the other side, I think, misunderstand, which is 353G4, that discusses what happens if part of the combination product has already been approved as a drug or a device. So if you have a drug component, but that's already been approved as a drug, and you want to include that in a device, then the statute can treat that as an already approved drug component. But it does not provide that treatment when the whole thing is being reviewed together. So in other words, if you don't have an already approved device component, it's all being reviewed together because it is all part of the safe and efficacious delivery of the active ingredient. And I think the guidance document that I've referred you to, I think, really is instructive on this point, because it explains why the particular inhaler and the particular dose counter are essentially bespoke for each inhaler product and the labeling that goes with them. The FDA says, and I think 1480, sorry, I got the pages wrong. It's 1418 to 19, not 88 to 89. And on 1419, you will see that FDA says it would treat a universal dose counter, if there were such a thing, as a device. It wouldn't treat it as part of the drug. Likewise, with other things like spacers and locking clips, it doesn't treat those as part of the drug product. It treats them as separate devices. But because you have a bespoke dose counter, in this case, and a bespoke inhaler, that is addressed, the specifics of which are addressed in the labeling, it's all part of the FDA's review. And when you look at the listing statute, it refers back to the drug for which the applicant submitted the application. That just tells the court, I think, to look back up to the NDA provisions, which say, when you wish to submit an application with respect to any drugs subject to the provisions of Subsection A, here are all the things that you list. One of the things that you list in Romanet 3 of that subsection is a full statement of the composition of such drug. All of these inhaler and dose counter items that we're talking about here would be part of the composition. So would an inactive ingredient. And I think our friends on the other side, likewise, would exclude a patent on an inactive ingredient from the Orange Book. I think all – What about the rest of the language that requires, and is a drug substance, parentheses, active ingredient patent? So I'm happy to address that. Let me just state at the outset, just to remind the court of our argument, that that's not what the counterclaim statute authorizes a delisting counterclaim to look at. But I'm happy to address that. In 2020, FDA's existing regulations, the terms in these existing regulations, which is what you just asked me about, Judge Prost, were put into the statute as part of the Orange Book Transparency Act. The legislative history of the Orange Book Transparency Act tells us that Congress was intending to codify FDA practice, not to change it. And indeed, sections 2E and 2F of the Orange Book Transparency Act directed a study by the GAO and notice and comment by the FDA about whether it should make changes with respect to certain combination product patents. But I think it would misattribute to Congress the intent to assume how that study was going to come out, to say that the Orange Book Transparency Act was changing the listing practice. Inhaler inactive ingredient patents, everything that we're discussing here. If you were a Senate staffer wanting to write a provision that covered only or was limited only to active ingredients, isn't this precisely what you would have drafted? Or how would you have otherwise had to draft it to reach that conclusion? So I think, and I'm glad that you asked me that, because we haven't talked much about the definition of drug in section 321G. And I think that what you would have to do is to say that we're going to write a provision for which this definition of drug does not apply. Because the definition of drug, you'll remember, in prong D of that four-part definition, says that any component of an article that meets the drug definition is itself a drug. And so the same is true of a patent on a component of a drug product. A patent on a component of a drug product is a drug product patent. Now, of course, it also calls out drug substance patents as listable. But I think that if you understand the structure of the statute, you will see that there's Roman I and there's Roman II. Roman I is for drug substance and drug product patents. Roman II is for method patents. And so the first question that you ask is, which are we categorizing this under? Because the requirements are modestly different for each of them. And the second question that you ask is, does this patent claim the drug for which the applicant submitted the application, if we're in prong one? And then the third question that you ask is, could a claim of patent infringement reasonably be asserted? So I think that that's the import of the statutory structure Congress has created. It requires different treatment of method patents on the one hand and drug substance and drug product patents on the other. But I don't think that you could read it as narrowing what FDA has listed for many years, because in addition to the study provisions and the legislative history, it's just adopting terms that were already in use by the FDA. And this is how FDA has ‑‑ listing decisions have worked as well before the OBTA. I heard you say something in passing quickly. And I saw it in passing very quickly in your briefs. I think it consisted of a sentence or two, which was arguably an argument that said that even if we're reading this a different way, you don't have a corresponding change to the contraclaim. But I really didn't see other than really a sentence in your brief that developed that argument at all. So are you telling me that's one of the arguments you were making in this case or not? It is one of our arguments. It is the second sentence of the part that discusses drug product. Now, remember the posture of this case. But am I reading the briefs right in terms of the extent to which you developed to raise that argument in the briefing? So we alluded to it briefly in, I think, a couple sentences in the opening brief, because, and then we have a whole subsection on it in the reply brief, and I'm going to explain why that is. Because, remember, the district court relied on what is the proper subject of a counterclaim, whether this claims the drug for which the applicant submitted the application. This other stuff about drug substance or drug product patent, that's an alternative ground for affirmance. The other side, understandably, wants the court to reach it. But in our opening brief, we were attacking the reasoning of the district court. We understood that the other side might make this argument as an alternative ground, and we flagged this so that they could have an opportunity to explain why this would be a proper counterclaim. They did not address it at all. They have no explanation of why it would be a proper counterclaim. And we've explained that a little bit further in our reply brief. Can you give me the citation to the reply brief? Because I know you raised it. It is somewhere in the reply brief, but I didn't think it was necessary. Section 3A, starting on page 18. All right. I can take a look at that independently. Sure. And the basic thrust of that is just that Congress had a conscious parallelism between the listing statute and the delisting statute. When it changed the listing statute, it did not make a corresponding change to the delisting statute. And ultimately, the court doesn't need to reach that if it doesn't reach the question as an alternative ground for affirmance. But I think that before the court did so, the court would want to at least either make sure that it is not going beyond its statutory authority or direct the district court to address that because we haven't gotten to the merits of that issue. And you think there's some common sense to the fact that, as you mentioned earlier, if we agree with you that what Congress was doing in these amendments was codifying longstanding FDA regulations and so it wasn't changing the meaning of anything, that wouldn't apply to the reference to drug substance, to drug in the counterclaim provision? I think that that's right. And so let me just say a little bit more about that. We're not saying that the change to the statute, to the listing statute, doesn't have any meaning, but we are saying that it is of limited practical significance because it was codifying the agency's existing practice. Obviously, it has statutory significance because now what was just in the regulations is in the statute. And so the agency is not free to change that at its own whim if it wants to. But we do think that you would need a parallel provision in the counterclaim statute to address this different point. If someone wanted to say, yes, it claims the drug for which the applicant submitted the application, but it's not a drug product patent. Ultimately, we think we win on that issue in any event. We think these are drug product patents. They address components of the drug product as FDA determines it. FDA determined that it's going to review all of this, including the dose counter, including the inhaler, and so on. It is no different than either an inactive ingredient or a second active ingredient in a multiple active ingredient patent. I don't think the other side has any explanation for how its reading would allow you to list, for example, a genus claim that doesn't name any active ingredient, but draws the meets and bounds around a whole genus of active ingredients. Well, might it not depend on whether the genus is defined in a way that meets the relatively low threshold of having patentable significance as opposed to a word like medicament? It's hard to see how that could have patentable significance, because it covers the universe of all possible things you would give to somebody to help their bodies. I'm not perhaps standing alone, Judge Toronto. I realize that I'm kind of addressing the premise of your question, but a medicament. Or patentable distinctness. I mean, words that say, okay, there's genuses, and then there's the universe of things, and maybe the universe of things you put in your mouth, but we're not yet anywhere near something that in ordinary course we would attribute patentable significance to. Well, so let me say two things about that. Our statutory test, our proposal for the way the court should construe the statute, is that if a patent claims a component of a drug product, then it's a listable patent. Now, if the question is, does this patent claim a component, or if you read the statute differently than I've just proposed, and you concluded that it has to claim the active ingredient in some way, I don't think that's a distinction that you can get from the statutory language, but let's assume that. I think the question would be to apply the ordinary tools of claim construction and ask whether the patent claims, i.e., reads on the active ingredient. Now, in the context of these patents, medicament is not by itself. It's a medicament canister in the context of a metered dose inhaler. That's one step further away from actually requiring the medicament to be in the claim. That is a medicament canister, you need to argue. It's a canister filled with the medicament as opposed to a canister for a medicament.  So if we were to, and I realize that the district court's claim construction, which just came out a couple of days ago, is not directly. We flagged the issues. Right. It's not directly before the court, but I'm happy to talk about why, if you read the statute to require the presence of an active ingredient within the claims, why the reason that we qualify is, I think, the two pieces of specification. Those are important parts of our argument that we put in the 20HA letter, which is that it describes the medicament canister as containing the medicament and a propellant. I would resist the idea that it's the entire universe of every medicament that could be used on the human body. It has to be a medicament that could be inhaled through the lungs. Right. Which is a fairly narrower subset. We think that the right way to look at it. Galaxy, maybe. Can I ask you a hypothetical? It's a genus. A genus of active ingredients. Can I ask you a hypothetical? Suppose you submit a new drug application for an injector device that includes the active ingredient and it's included in an injector device, but it also has some kind of new tip on it that you've invented. Is the patent solely on the tip, without any reference to anything else in the new drug application, a listable patent? Can I ask one clarifying question? It said that if the claim begins, a tip wherein, or something like that, unlike this patent which begins an inhaler wherein, blah, blah, blah. I still think the answer could well be yes, but whether that's true in any individual case would depend on how FDA is reviewing this product. I know. This is hard because this area is a little beyond me and I don't know how to flesh out the details much, but just what you're submitting to the FDA looks like an inhaler device with an active ingredient in it, but I'm just using the injectable because I can come up with a better hypothetical. You get a box with basically a syringe that's preloaded with an active ingredient and that's what you use to administer the drug. You have to get an NDA for that, right? It depends. So let's just assume you have to. If you do, then my answer is yes. Okay. But that's going to be a listable patent. You do have to, and so your answer is if the patent is solely on the tip, that doesn't relate to in any way is it not inherent to this specific drug or this specific use, but you just came up with a new tip and you put it on this, that's still listable. So if, as I'm understanding your hypothetical, that sounds like a component of a new drug, right? So the definition of drug, which is at page two of the addendum to our friend's red brief, D, articles intended for use as a component of any article specified in A, B, or C. This sounds like a component of a drug product. Now, it probably would be a component that a generic and a submitter could design around, right, because only the active ingredient has to be exactly the same. Generic manufacturers can and do design around things like that, and that addresses some of the concerns about delay that our friend's policy arguments get to, because you can, if you don't use the patented tip, you know, you send your paragraph for notice. The brand asks to look at your ANDA under the offer of confidential access that the statute allows for, and the brand says, this doesn't infringe. We won't sue. There will be no 30-month stay, which I think deals with that situation. Would you mind just restating your component argument for me, please? Right. So the definition of a drug, right, which is at page two of the addendum, right, includes A, B, and C, and, you know, a drug as it would be ordinarily understood in sort of common parlance might well be either B or C, either something intended for use in cure, mitigation treatment, or an article intended to affect the structure or any function. I think article is itself a broad word, but then D makes it broader still by saying it also includes articles intended for use as a component of any article described in A, B, or C. So we think that the necessary import of this, that if you apply this statutory definition, which our friends on the other side urge you not to apply, at which the article in your view is the machine. No, the article, like, I mean, I mean, you know, the device, not even. I would say it's the drug product, Your Honor, so that includes everything that is reviewed by the NDA. Assume you're not actually within the drug product. I realize you have an argument. You want the machine to be part of the composition. Put that aside. I just want to understand where the – I'm literally not following what the component is in your view. So we think that the component is every part of the article itself. So the article would be the – The inhaler with the medication. Yes, and every component of that. And so what's the component? It could be the inhaler. It could be the tip. But in your view about getting this into the drug. Oh, so why do our patents claim a drug, right? Because, well, our leading patent, the one we reproduced on the inside front cover of our brief, claims an inhaler, right? And so the inhaler, that is the article we're talking about. Others claim a dose counter, which is a component of the inhaler product. Each of those things is a component of the NDA product that FDA is reviewing. They're all part of the composition of the drug that is reviewed under Romanet 3 of the definition. They're all bespoke aspects of this drug product that FDA reviews for safety and efficacy. I guess what I'm confused about is it seems to me your argument is kind of done when you just get to the article. Oh, the article is the inhaler with the drug. And so you want to say that's what we claim, that's what was approved. Why are you talking about components? I think that I now understand the question better, and I'm sorry for not getting it the first time. I think that it's confirmatory in our view. In other words, it is confirmation that this definition does not want to, or does not direct the courts to or the FDA to, slice off individual pieces and say, well, that's not really the part of the drug. So this is why an inactive ingredient, for example, is nonetheless considered a drug when it is used as part of a drug product. It is an article that is a component of the drug product. Of course, we think that the article in question would be the tablet or the inhaler or any of the finished dosage forms that's listed in Appendix C to the Orange Book, which is in the record. Of course, we think that's the article, but the fact that every component is itself a drug, I think that helps to refute the other side's argument that things that are only components and that are not the active ingredient are somehow excluded by this statute from being treated as parts of the drug. Any patent that claims a component of the drug or its entirety claims the drug for which the applicant submitted the application. And I think the other side says that, no, you have to claim the entire drug product or else the drug substance. I literally don't understand how their test would work for the entire drug product, because it seems that they're saying that it has to list in the patent every single aspect of the composition of the drug product or else it doesn't read on the drug product. And that's not how this court ordinarily describes claiming. Claiming ordinarily under cases like Suntiger means all of the patented elements appear in the allegedly infringing article. And that is exactly the reading that we want the court to give. That is exactly the reading that would treat these patents as listable, because each of the claimed inventions appears in the drug product. The other side at the top of page 20 of their red brief want you to use a different formulation, like explicitly claims or words to that effect. But that's not the established meaning. Steering wheels in cars. Yes. So a patent on it. Thanks for understanding the shorthand. Does a patent on a – would we say that a patent on a steering wheel claims a Ford Bronco? Is that – Yes, of course. Right. So I would say that in the way that this court uses it, certainly. Yes. And certainly when you add 321G and the component. In a way that the court uses it informally where it makes no difference, maybe. But nobody, nobody would think that if I have a patent which I claim as my invention, the steering wheel, that I'm claiming the car that it is in, even though, of course, everything that it is in, the claim reads on everything that it is in. Let me respond to that in two ways. First, if the claim says a car wherein – that comprises, so it's written in open claiming as these patents are, a car wherein there's a steering wheel. You mean the comprising thing?  Oh, okay. So, all right. That's one answer. Right. But if you say a car comprising, and all you talk about in the comprising language is the details of the steering wheel, I think we'd have no problem saying that that claims the Ford Bronco, even though it doesn't also describe the wheels, the exhaust pipe, or anything else. Because adding more elements – And if it doesn't claim the car, if the claims don't use the car, it's just the steering wheel? So, right. If it says a steering wheel wherein – I mean, we certainly would say that that claim reads on the Ford Bronco if it has – And do you have to enable and provide written description for the Ford Bronco? I don't think so, because you have – But you couldn't, obviously. Right, right. It's a rhetorical question. Right. You would – what you have to do is provide written description of the full scope of the claimed invention, right? And that would be an invention that has the specified elements, but you – I mean, under your definition of claiming, which is the same as it reads on. Well, it is the same as reads on, whereas I think the other side's definition is something much more specific that would require you to list in the – say that it doesn't claim the Ford Bronco unless it has every single system in the Ford Bronco somewhere in the claims. And I don't think that that's – that's an accepted reading of the use of the word claiming either. Well, I'm less concerned about what they think claiming means and more concerned about what a court thinks claiming means. Right. So I understand the – what claims to mean read on, and I understand read on to mean that the accused product contains all of the limitations of the claim. If it is an open claim, the accused product can have other stuff in it too. If it's a closed claim saying consisting of, then it can't. Notwithstanding that that goes beyond the literal meaning of 112B now, I guess, where you're claiming as your invention. Even if somebody wrote a claim to, say, a car comprising a steering wheel and here are the nifty features of the steering wheel, nobody would say in any kind of ordinary parlance that you were claiming anything other than the steering wheel as what you invented. So I appreciate the question and I appreciate the reference to ordinary parlance because I think that in this context, ordinary parlance is not where the court should start. Right. Because we're talking about a statute that gives specialized meaning certainly to drug and we think also to the patent law meaning of claims as meaning reads on. But in this context, so because of the definition of drug, which includes this language that a component of a drug is itself a drug, that I think tells us that if there were a like statute for cars that would say, treat a component of a car as itself a car, you would have no trouble whatsoever saying that under that framework, a claim to a steering wheel that is used in a car, that is approved by the car approving agency, would itself claim a car. It's admittedly a specialized framework using specialized meaning, but that meaning has had a pretty established, that term has had a pretty established meaning for a long time. The definitional statute directs the court to apply it throughout the FDCA and our friends on the other side pretty much explicitly say, everywhere except here, please don't apply it here in the listing statute. But I think for you to disregard a statutory definition, you would have to find some clear repugnance between the statute that uses the term drug and the statutory definition of the term drug. I don't think that our friends on the other side have shown that and the decision of the First Circuit that they rely on I don't think faces up to this either. Thank you. Thank you very much, Your Honor. We'll restore some rebuttal time. May it please the Court, we're pretty far along here. We know these patents do not claim or recite the NDA drug product or the active ingredient or device claims. The question is whether they meet the requirements of being drug product patents that claim the drug for which TEVA submitted the NDA. TEVA says they are, if they are, would be infringed by any portion of the NDA drug. We spent a great deal of time talking about definitions of drugs and our main point here is that the statute doesn't say a drug. It says the drug for which TEVA submitted the NDA. And everyone agrees on what that is. That's the pro-arabutyl sulfate aerosol inhalation product. Can I just say, this may be a trivial, very minor point, and nobody seems to be saying anything about it. So I'm looking at appendix page 642, which I think is the FDA announcement, I don't know, it's like the label or something that goes with the approval of this. And what seems to be claimed is the Proware HVA inhalation aerosol. Is it just the aerosol? The aerosol is not the machine. The machine spits out the aerosol. The aerosol is what interacts with the human body. Right. So why is the application for the actual inhaler device, whether or not filled with aerosol as opposed to, at most, for the aerosol? I think it's a product that would be a combination product. That's how it got categorized. This case has been litigated very much on the assumption that the application is for the machine with the aerosol in it. Yes. Right. Yes. Okay. So amnial's construction is that claims the NDA drug for a drug product patent is that claims must require the presence of at least the drug substance of the NDA drug in the claimed invention. That's the floor, because that's what ties it to the actual application for which the drug for which the application was submitted. And we say that our construction best harmonizes several things that TEVA is sort of at war with. First of all, we have the infringement requirement that comes before these sections. Are you talking about the listing statute now? Yes. In the listing statute. And one of the three requirements, only one of which appears in the delisting. Right? Right. The infringement requirement doesn't appear in the delisting. I just wanted to keep track of which of your arguments is about, I think what Judge Chesler concluded, that the specific language for what can be a counterclaim for delisting is it was all about that language. There are these additional requirements that appear in the listing provision, the three requirements for which you have arguments that he did not reach.  Right. So if we have three requirements, the first one is an infringement requirement, and that's the one that says for each patent for which a claim of patent infringement could reasonably be asserted. The second requirement, then, is either if you're a drug product or a drug substance and so forth, and off we go. We submit that Congress knew how to make an infringement requirement when it intended to do so, and to transform the claims of the drug requirement, the next one, into an infringement requirement kind of doesn't make sense. Congress knew how to use the word infringement, used it when it wanted an infringement inquiry, and it knew how to use the word claims when it wanted a different inquiry than infringement. When it wanted, we say, the plain meaning of claims, which is when we ask what a patent claims, we try to find them. I'm sorry. Just a slight version, slight different version. I'm going to assume, I realize the other side, this is not, I'm sort of making something up here, but I'm going to assume that the infringement language here in the statute is literal infringement, right, that they have an argument that obviously infringement covers more than literal infringement and that's a reason for having that provision in it, but I think your argument now is I'm reading the infringement, one of the trio, to mean Congress knew how to say read on. We want an infringement. The last requirement, or anyway, the one that's in the delisting statute shouldn't mean that. Right. Well, also, one of the things that, yes, you're correct, and the other side does say, well, listen, claims the invention, claims the application is different than the infringement requirement because it refers to literal infringement, and we suggest that's even more suspect because we don't have Congress making two infringement requirements without saying so, and also if what Congress wanted to require was literal infringement, there would be no need for two. Congress would just say literal infringement, yet our colleagues say Congress intended this separate literal infringement inquiry even though it never used the word infringement in the claims, the drug for which the application was submitted. We also have different sources of meaning for a great deal of what we've been briefing. Our sources of meaning generally come from the FDA regulations, which are not dispositive and you don't need to accept them, but we offer them as persuasive authority as against what they offer, and those regulations with respect to drug product patent and drug substance patent make clear that you need to have contained within this an active ingredient, and so we don't see how they could be a drug product patent that claims the drug for which the application was submitted. What about your friend's argument on I guess it was on section 321D, the articles and the component argument? Of the definition of drug? Right. Yes. If the statute read claims a drug, then we would be the first to go look up what drug means, but they didn't do that. They said claims the drug for which the applicant submitted the application here, TEPA submitted the NDA for the pro-arrow butyrosulfate product. So what would have to, I'm now thinking of Mr. Jay's focus on the genus problem for you. How do you solve that problem? In all candor, I don't know that I can solve that problem. I'm not sure it's a problem that needs a resolution certainly for this case. This case involves one active ingredient, and although it's been ruled on below for now. Medicament is a genus for this active ingredient.  And that's obviously too broad. How do I get to that obviously? Okay. Obviously it's not specific to the drug that TEPA applied for. When Congress, we say that when Congress added a claim to the drug, or the drug first to submit the application, on top of infringement, Congress was looking in this way to get more specificity to the actual NDA product than an infringement analysis. That's what we say. It's from the structure of this is what Congress was after. And we think the legislative history of the OBTA, the Orange Book Transparency Act, support that further. They were tightening what can be listed. And tightening the link between what can be listed and the actual NDA product. Remember, this is not about patentability or anything else. This is about whether a patent gets essentially superpowers. The superpower of an automatic 30-month stay, which is a preliminary injunction without any signs. And also, at the end of this litigation, the superpower of sidestepping eBay. It's an automatic injunction. The question isn't whether these patents can exist or whether they can be asserted against us or other people. Sure they can. They're patents. The question is whether they get special treatment. And we suggest that in this statute, Congress wanted to restrict that special treatment to patents. Why doesn't the special treatment come with the special negative treatment? I'm thinking, I guess, of the D.C. Circuit decision, genus, as that was called. Genus medical? Which describes how there's a drug regime, there's a device regime. By and large, the drug regime is much more demanding and much more expensive to comply with than the device regime. And so with all things considered, many applicants might prefer to be in the device regime. So why shouldn't somebody who is forced into the drug regime by a determination of the, under the combination definition, not get the full benefit of every other drug that's under that regime? We suggest that if Congress wanted that to happen, if Congress wanted to say, okay, if you end up in the drug side and you have to go through all the drug tests and it's terribly onerous and it's an incredible feat, we're going to say anyone who goes through that can list these patents. Congress could have said so. Congress didn't say so. Congress said, first, would there be infringement? Second, the patent claims claim the NDA drug for which the application was submitted. That's very different than saying, hey, if you are processed and reviewed as a drug, congratulations, you're listable and you get your automatic 30-month stay and your automatic injunction. What if the patent here, instead of just referencing the document, it had listed a whole list of like 10, 15 different active ingredients and included albuterol. Would that be a proper listing? I think it would be closer to one than certainly what we have here. I mean, it would be describing the drug that was sought NDA approval for and that it was an inhaler with albuterol. It just happens that the patent is broader and includes inhaler with albuterol or any number of other ingredients. Well, certainly, when it comes time to write patent claims, these folks can write whatever claims they want. They can call out a specific active ingredient and it's no great shame for them to have to do so if they have 10 ingredients. Let me, maybe I started a step too far. If this patent listed albuterol, we wouldn't be here, right? It would cover the drug product. If albuterol were listed as the active ingredient in any of these claims, yes. Okay, so if albuterol is... Albuterol sulfate. Right, right. I'm just shorthanding it because I will ultimately mispronounce everything or misdescribe it. If that's part of a list of various things, and it seems like that should also be the product. So here's where I want to take you. What if instead of a specific list of different active ingredients, it said something that's more genus-like, like any drug that's therapeutically effective to treat asthma? Would that be listable? I would suggest no. And why? Because... Well, it might not be patentable. Well, no, no, no, sure. They're not going to write that because it might not be patentable. But let me... And I'm having trouble making sure that my hypothetical is covered. Let's just assume that a skilled artisan, when you use that phrase, would have known that it covered that same list or something similar that we just talked about that actually called out specific active ingredients. But they didn't identify them by name. We return to the plain meaning of claims. We return to what do you ask when you want to know what a patent claims? And what you ask is what do the claims require to be present? And if albuterol sulfate's not there, then it's not, and it's not listable. But if a skilled artisan would know that this more genus-like formulation includes albuterol sulfate, even if it's not explicitly called out, isn't that claiming the drug? It is going to depend on the genus. It would have to. I guess your view is that here... Which we don't have here. Even if that were okay, just claiming medicament is not nearly enough. Right. What about the 7-12 patent, which does reference albuterol in the specification? Not in the claims.  Yes. We would still look to the claims. Well, no. I mean, our lessons in claim construction are based on Phillips, which says you use the claim, you construe the claims in connection with the specification. You don't ignore the specification in order to determine what is claimed. We wouldn't import those limitations from the specification into the claims. We would start with the claims and see what's there. And if there's nothing there, the fact that one patent has a reference among other compounds to albuterol, I don't know if it's albuterol sulfate, but doesn't change the analysis. The question is whether the claims are specific to the patent for which the application was made. The notion is that Congress was interested in the specificity to the application. That's why they invoked and added the drug product and drug substance patent requirements, which were already in the regulatory. Because these required, in fact, the drug substance by its definition is the active ingredient. So we say Congress set a floor there. We don't know in every case what the answer is, but we do know that without the active ingredient, you don't have that connection to the particular drug product they submitted the application for. Can I ask you a general question about genius claims? It's hard for me to see, and this is your area of expertise and Mr. J's and not mine, but it seems like all the requirements for approval of a drug thing in 355, all are very specific. The drug needs to include full reports and investigations to show it is safe, containing specific active ingredients, not geniuses of drug products containing potential geniuses of active ingredient. It seems like the requirements to get the approval, to get the stuff in the first place for the NDA, doesn't feel like you're claiming a genius. No, and you can certainly, you don't need to claim a genius. You have the ability to claim as specifically as you're doing the application. Part of what maybe I'm hearing in this last little discussion is something about an argument to the effect that genius in the claim, in order to work for the other side, must match what the approval was for, and there's no chance that the FDA approves a drug where the label is, this is a medicament. Right. That's why we say. With no further, that you effectively could not possibly have an FDA approved class. It's difficult to say that that's specific to the application when, as you say, you can't have an application for a medicament. So does that suggest a helpful limiting principle for you? For us it does, yes. If it's a genius beyond the active ingredient of the application, then no, that shouldn't be listed. But this is not a genius case, and I don't know every genius possible. But as you say, there are some that are possible for whatever you put in your mouth, and there are some that are possible for medicaments. And there may be some out there for a multiple ingredient, multiple active ingredient product. We haven't gone into that because it's really not before before us and for the district judge. Mr. Jay referred to a particular provision that would cover a device that's a combination with a previously approved drug in the traditional sense. Yes. Is this that or is this not that? Well, albuterol has been around for some time. I don't believe that's this. Do we know how? So the albuterol sulfate aerosol here you're saying was? I mean the active ingredient. I don't know if it was aerosol. Oh, I see. Okay, just the active ingredient.  Okay. Do you prefer that? It looks like I'm beyond my time, actually. Well, we've extended the time, so if you have anything you want to say, I'll give you a couple minutes to say it. If not, it's fine. You can sit down. Yes. When we're talking about the cause of action, the so-called counterclaim statute, that is key to what you can do on the ground that the patent does not claim either the drug for which the application was approved or an approved method of using the drug. And this was parallel to? Well, is there not an argument whether it was developed or not is another question, but is there not an argument when Congress swooped in and decided to make amendments on the listing part of it, they obviously thought they were doing something of consequence and wouldn't one necessarily assume, therefore, that similar or corresponding changes would have to be made to the counterclaim section to correspond? There is that argument, although we submit you didn't need to do that because the patent that it's talking about in the counterclaim statute, I think it's a hard press for anyone to say that doesn't correspond now to the drug product patent and the drug substance patent in the listing statute. And what about the GAO report, which is an argument that the other side makes about the GAO report that suggests that Congress looked at this question and what it concluded was we need more study and more information, not that they took care of the problem. I didn't take that out of this, out of that request to the GAO. I suggest that what it says is that Congress had in mind a problem or a potential problem that doesn't make sense under their claim construction. It only makes sense under ours. But why did they necessarily decide? Usually, well, not usually. I don't know what usually means, but sometimes when Congress asks for a study, it means we may want to legislate in this area, we may want to do something, and we're going to ask for more information in order to decide whether to do it. Here, under your theory, they did it and then they asked for information, what, to confirm what they did? The short answer is neither of us, neither side, knows what Congress had in mind when it asked for that study. We cited it because it seemed to us clear that whatever Congress had in mind, it was contemplating a situation where we had device patents being listed for device combination products, inhalers and others can be listed. I'm suggesting that Congress couldn't have had that in mind as a problem if what Congress had in mind was claiming the product for which you submitted the application to be an infringement inquiry. There would be no need for it. What we're suggesting is it's an indication of where Congress's thinking was. It's not necessarily an indication of what Congress intended to do, because we don't have, I don't believe Mr. J., nor I, have any further information on that study. Thank you. We'll restore two minutes. Thank you very much, Your Honor. I appreciate that. I think that Mr. Maddox candidly said that he can't solve the genus problem, that if you have a claim, forget inhalers and injectors and all of that, if you just had a claim to beta-adrenergic agonists, which is the class to which albuterol sulfate belongs, surely that ought to be a listable patent for a drug product for which the active ingredient is a beta-adrenergic agonist. There are lesion genus patents that this Court has seen in many of its Hatch-Waxman cases. But maybe the genus problem doesn't have to be solved in this case, because these patents are, I guess to use the FTC's language, drug agnostic. If you were to adopt a statutory construction that says what Mr. Maddox was arguing for, that it has to specifically call out the name of the active ingredient, then you would definitely have the genus problem. If you instead said, our statutory interpretation is that you have to claim in some way the active ingredient, then that's a different question. That is not the interpretation the District Court reached. I think if that's what you thought of the statute, what I would suggest that the Court should do is you should reverse the District Court and ask the District Court to figure out whether these patents qualify under that standard. We haven't fully briefed the ins and outs of the claim construction that arrived earlier this week. I'll be happy to address that more broadly, but we would say that our patents claim a genus of active ingredients, and albuterol sulfate is within that genus. If that's wrong, it's a matter of claim construction rather than statutory construction, and we think the Court should fix the statutory construction and not adopt Mr. Maddox's statutory construction, which squarely presents the genus problem, the inactive ingredient problem, like a patent on an inactive ingredient ought to be listable, and the same thing for a patent on one of two active ingredients. So Mr. Maddox, I think, would say that, well, the a and the the tells you that that can't be listable. If a patent on an inactive ingredient matched an application, would that application sometimes always never go through the drug application process? So a, you're right that if it was – I'm going to give you a concrete example. So you know what ethylene glycol is, right? It's an antifreeze. It is often an inactive ingredient. I understand that there is some NDA somewhere that has treated it as an active ingredient. So if there were no drug product that treated ethylene glycol as an active ingredient, then sure, a patent on ethylene glycol would never be listable. But if a drug product comes along that treats ethylene glycol as the active or as an inactive paired with an active, then sure, that patent should be listable because an innovative inactive ingredient, you know, that's exactly the kind of thing that the generic might infringe in making an ANDA product. And the notice function of the Orange Book is well served by having those patents that are likely to be infringed listed in the Orange Book. The drug definition doesn't – is not limited to active ingredients. That's exactly our point. The distinction that Mr. Maddox tried to draw between some genuses and other genuses – it doesn't come from anything in the statute. The statute does not limit drug to active ingredient. Quite the contrary. And indeed on the point about age claims the drug for which the applicant submitted the application, it says the and not a because it's referring back to the drug that's described in the earlier subsection describing the application itself. That might have two active ingredients. The reference to the doesn't suggest only the singular. The singular can include the plural under the Dictionary Act after all. I just want to get back one minute to the contrast between the delisting and the listing statute. What would be a reason that Congress would want to limit the delisting ground to only part of the three requirements for the listing and in particular for not allowing a delisting challenge on the ground that this doesn't meet the drug product definition?  I think that the counterclaim statute was added in the early 2000s and – I don't mean a chronological reason. I mean why would this make sense? Oh, sure. I think that the reason why it didn't update the counterclaim statute to reflect that I think just suggests that because it was codifying existing FDA practice that it didn't see a problem requiring litigation in Hatch-Waxman cases for delisting on those grounds that the existing counterclaim statute would catch what needs to be delisted. Did the pre-existing FDA practice clearly include delivery hardware? This goes back to my colloquy with Judge Hughes earlier and to that guidance document at 1418-19 that I butchered the citation for earlier. When you submit a patent to the FDA, you must fill out the form that checks a box for whether it's a drug substance patent or a drug product patent or a method patent and then the requirements flow from which box you've checked. So you asked whether that would include what you call delivery hardware. That depends on whether the NDA in question is reviewing sort of bespoke features that – I mean they might not be an excipient but they're part of the drug product because this dose counter or that inhaler or that injector is part of what's necessary to make this product as labeled delivered safely and effectively. If, on the other hand, if it were a generic or universal dose counter, that's the example that we give from page 1419, it wouldn't be reviewed by the FDA for that reason. It would be outside the NDA. It would be in a device. It would be reviewed as a device and so a patent on that would not be listable. Thank you. Thank you very much. We thank both sides for cases submitted. That concludes our proceeding for this afternoon.